Thank you, Your Honor. Thank you. Good morning. I'll try to reserve about seven minutes for rebuttal. I know we've got to keep our own time. Good morning, and may it please the Court. My name is Peter Breen. I am here on behalf of Defendant David Daleiden, Defendant Appellant. After reversing the prior appeal, reversing the preliminary injunction, plaintiffs bore the burden on remand to make the required clear showing with specificity as to three primary issues. First, that specific individuals or groups of individuals are involved in particular First Amendment activity. Second, that the information to be disclosed in the Public Records Act documents would subject those specific individuals to threats, harassment, or reprisals. And third, that those threats, harassment, or reprisals would have a chilling effect on the identified First Amendment activity. Plaintiffs met none of those burdens on remand. This Court, during our first oral argument, various members indicated concerns about whether research is generically a protected First Amendment activity, about the sufficiency of plaintiffs' evidence of their own First Amendment activity, and of connecting the chilling of that activity by disclosure of the requested information. As well, the district court on remand invited additional evidence. Despite the doubts at the first argument in this case, the plaintiffs produced no additional evidence on remand. Instead, they've turned into this campaign of character assassination against my client. And what we would contend the record shows, the only party in this case with identifiable First Amendment advocacy work is Mr. DeLayden. And he's now being pilloried for his own effectiveness in terms of his advocacy. Sotomayor, let me ask you, with respect to advocacy, if you go back and you look at these revised findings and conclusions by the district court, there's very specific talk about advocacy, and advocacy with respect to abortion and fetal tissue. One of the challenges here on appeal is that we look at these findings for clear error. Would you point, with respect to your advocacy argument, to where you think the district court went wrong on its findings? Verrilli, and Your Honor, the district court had no specific connection between the does, the various, the eight people who are in this, who have brought this lawsuit as class representatives, and actual advocacy work for those individuals. Instead, the district court really went more, the district court went at the research as the generic activity that ties everyone together. And yet, you wouldn't call the Seattle Children's Hospital, the Birth Defects Research Laboratory, and Planned Parenthood, you wouldn't call them an expressive association or some sort of First Amendment group. In fact, we don't know that, of the 600 or so people that are mentioned in the documents, if they even agree on the issue of pro-life, pro-choice. Are they advocating for more funding for this research or less? We have no way of knowing, and it's not indicated in the documents. Well, they don't need to be aligned in their, what sometimes might be viewed as a political view, if in fact, if you look at who's associated with research, I think there's a listing of all but does four and eight, and eight is directly involved with research. So if your point is that these institutions need to be aligned, I'm not sure that's required, but maybe that's not your point. Well, and Your Honor, aligned or not aligned, advocating in some way, making some sort of First Amendment activity, the major cases in this field, you've got, you know, lists of socialists, you know, socialists and the folks they're doing business with, NAACP members, you've got folks who are exotic dancers, lists of exotic dancers, or lists of folks who signed a petition to change a law. Those are the main cases, the four main cases, and we've got nothing even close here. Instead, we have this generalized idea that research in this case. I mean, I guess you're assuming, and maybe this is correct, but when you say close to here, you mean here, I guess that those seek protection for those who may not be directly involved in advocacy, but are associated in some way with an advocacy organization, right, such as staff support or something like that. Is that right? Sure. Yes, Your Honor. Isn't that sort of the way the district court looked at it? Yes, Your Honor. All right. So tell me now, what's wrong with that connection? Well, and the district court used Brown v. Socialist Workers to make that connection, which, of course, it was the follow-up on Buckley v. Vallejo, which was about, it was about minor political parties. It was about socialists at the time who were subject to, and really the way the Brown court put it, at 495 U.S. 98, That was the issue. There's no risk of that here. We have a great national debate over abortion. It's been going on for 50 years. There's no risk of that being shut down by the production of invoices from the University of Washington. And this is the problem, Your Honor. Research itself is not a protected First Amendment activity. And the one case that was even close, Dow Chemical, which was a case out of the Seventh Circuit, that case talked about preliminary research findings, that that was what could be protected. The plaintiffs and this preliminary injunction didn't ask to have preliminary research findings or any research findings redacted, and they're not. The mere fact of the research occurring, those involved, the amounts of money spent are not, they do not in any way touch that. May I ask you about the invoices? Were you, I think as a general principle, the fact that the State, meaning the Federal or State government, is spending money on certain research is not a protected activity in terms of the disclosure of that. Here my understanding is the argument is that there's, there isn't an objection to disclosing the invoices, but where they contain names. Am I correct about that? And, Your Honors, this has been a point of contention. Okay. We disclaimed names and personal contact information in our, in the Public Records Act request. And really the only thing left in terms of this specific request before the Court is job titles, because the district court actually went back and allowed us the corporate information. So really job titles are it. We. So once you take out the names and then you leave the money or the what thing, what money was spent on, the only issue in your view is could a job title such as Director of X be disclosed? Right. And certainly, we did that in order to avoid litigation. Of course, it apparently didn't work. It didn't work. Yes, Your Honor. And in our view, if a job title has been associated with a name publicly, well, then that wasn't our fault and that's not the Public Records Act, which looks at the four corners of the document. It'd certainly be unreasonable to ask a public records officer to go out and go, well, did your job title get associated with your name in some other venue? And so, so we, we would, we had hoped that that would eliminate any of the dispute here. Well, let's take the case of a university researcher, because most of job titles and researchers are connected somewhere, either on the website or in research databases. So if that is true, but then you're linking the job title with the expenditure, what's the difference between that and just putting the name on there? Well, and, and, and, Your Honor, that's, that is, it's outside the four corners of the, of the record. And so that is, that is outside the scope of what a public records officer would be asked to do under Washington law, and we would say reasonably. But as well, there's some other public, if you've publicly put yourself out there with your job title, well, that, that's not something that, how can you then say that you would be chilled in First Amendment activity by putting your job title out in connection with an expenditure? And, and, and of course, we, we had the issue of the eight publicly affiliated folks with fetal tissue and abortion who are very public on this. And, and just since you brought it up, Your Honor, you know, in discovery, since our last appeal, at least two of the does have publicly put themselves out in the New York Times, MSNBC, or Politico, we have learned, through discovery. So they're proceeding as does, even though they've put their name in a national publication in connection with the issue. So that's, that's why we're, we're so frustrated in terms of my client. Scalia, what are you arguing? Is it sort of like a forfeiture? Well, it, it's more that, that how in the world can you say that you're being chilled when you've put yourself out there on this contentious issue? All we're asking, these, these are invoices and the, the records of the movement of the raw materials for research. And I understand it's very controversial. I don't want to minimize it. But it's very, but that's really what's happening here. And, and so, you know, the. Well, I think the, the response to that is that you are getting the record, the public record that demonstrates the movement of the fetal research material. It's just, you're not getting information that would then be pieced together with people's identities and their enroll or involvement. But let me, let me have you go back for a moment to Judge McKeown's point about the fact that we're dealing with a different record than we were the last time we were here, in that we have specific factual findings now with regard to the eight does. And I heard you argue that there's really nothing there to support the eight doses that are being supported. Would you agree that the factual record is slightly different as to each of the DOE plaintiffs? In other words, are we now grappling with going through the record for each and every DOE plaintiff in order to determine the strength of the findings as to each one? Because on some of them. I know I'm eating into my rebuttal. On some of them. They're really supported by declarations talking about their role in coordinating the donation, for example, fetal tissue. Would that DOE be differently situated than somebody who's just merely associated with the organization? You're not quite sure what that DOE's job is for that organization. Verrilli, Your Honor, as we made the point in the last argument, certainly we know about what these DOEs are doing, but we knew before. And really all the district court did was kind of double down on the prior conclusions. And yes, there's a little more, there's a little more in the way of text, but nothing changed at all in the analysis. Nothing changed in the factual record below that wasn't before you previously, where you still have no evidence. Facilitating fetal tissue donations is in no way an expressive activity. It's in no way a First Amendment activity. We've still not got any of that. And it's a the First Amendment associational privacy has never been used to cloak government workers on government time. That hasn't changed at all. And all of these, these are not issues of, well, is this fact correct or should the court have read it this way or that way? Those relevant facts are essentially undisputed. We're really looking at a legal issue. Do you want to reserve your remaining time?  Thank you, Your Honor. May it please the Court. My name is Stephanie Olson, and I'm representing the Washington Coalition for Open Government, a nonpartisan that promotes the open government laws in Washington, and we are the only entity here today actually defending citizens, Washington's citizens' rights to public records and the Public Records Act. The district court's reissuance of the preliminary injunction does at least two things. First, it guts the PRA by creating an unworkable situation for public records officers and local agencies and sets up huge barriers where the public, the citizens have been enjoying for the last 50 years and access to public records. And it also is based on an incorrect interpretation of the WPA case in Washington Article 1, Section 7. By the way, what is the status of that case? It is currently before the Supreme Court awaiting a decision, but the WPA case does not apply to this case because the only issue in that WPA case was the corresponding birth dates, and the WPA case was very clear. The district court just, it was a simply incorrect interpretation of the WPA case because at issue in that case that went up on appeal was, well, at first in issue of the case, the lower court was the names, the work e-mail addresses, and the corresponding birth dates. And the court of appeal only did not extend the injunction to the names and e-mail addresses, and it only decided the corresponding birth dates. And if you look at the actual language in the WPA case, it's very careful to only identify names associated with corresponding birth dates because that court knows very well the broad reach of the PRA and the very narrow exemptions that must apply. And it makes sense because a year earlier in the 925 case, 925 v. Freedom Foundation, that court held specifically that the Article I, Section 7, did not apply to state of the court. Sotomayor, meaning the court of appeal or the Washington Supreme Court? The court of appeal, Division II. Right. So what we don't know out of the Washington Supreme Court is what the scope of its opinion will be. As applied to birth dates, not as applied, which is not at issue in this case. The state contact information, which was allowed by that same court, which is not at issue in the WPA case, has been held to not be covered by Article I, Section 7. And so, therefore, the WPA case does not apply and its holding does not apply. And that part of the district court's analysis must be reversed. So the bottom line of that part of the case, in other words, you know, what's the result under the Washington constitutional privacy protection? The answer is it doesn't affect this case? Absolutely. Because what's at issue in the WPA case is the corresponding birth dates, which is not at issue here. There's no birth dates and there's no personal contact information that's at issue in this request. And that's as to the WPA case. But in terms of the actual effect on the PRA, both as to the local agencies and the public records officers, it places an insurmountable burden. Public records officers and local agencies now must try and decipher between potential 1983 liability on this vastly overbroad interpretation of a First Amendment protection to any conceivable controversial issue, and if they choose to disclose. But if they choose not to disclose, they're facing substantial penalties under the PRA. We're here on a preliminary injunction. We're not here on the be-all and end-all as to where the case may end up. So, given the abuse of discretion standard, all we have is a determination of likelihood of success, but we don't actually have a final determination here. So your sky-is-falling situation seems premature to me, at least as far as the posture of this case. Well, as to the theory of, this is the theory of the law that it sets up and essentially allows the First Amendment extension. So the record is still insufficiently developed, but we're looking at an extension of the First Amendment to justify a likelihood of success. And if this is the likelihood of success, this is the potential outcomes on the Public Records Act. This is the catch-22 that agencies are faced with, especially when the burden falls most heavily on the local agencies that are already have a limited budget and resources now trying to attempt to define the scope of what's happening here. And not only that, it requires a distinction between the identity of the requester as to try and determine this potential harassment and then the inquiry, going into the inquiry of the purpose of the request, both of which are categorically prohibited by the PRA, and for good reason, because it invites discrimination as to the requester and to the purpose and discretion over the request. And also, in terms of actually accessing routine government documents, citizens for the last 46 years in Washington have highly prioritized basic, knowing what the basic transaction of what its government does. And these documents at records, these invoices, these purchase orders absolutely do not touch on that expressive activity. Thank you. Thank you. Good morning. May it please the Court. I'm Vanessa Power here on behalf of the Doe Plaintiffs. And, Your Honors, I will start by addressing some of the questions that were raised in the opening argument by Mr. DeLayden. And the first one I'd like to address is the scope of what is, in fact, before the Court today. As the Court has noted, we're here to support and ask the Court to affirm the granting of a preliminary injunction by the District Court. And the scope of that is quite narrow, and it is limited to the context of this case. There has been argument that this will change the law in Washington. We certainly don't think that's the case at all. This is simply applying the Public Records Act and applying exemptions within the scope of the Public Records Act. We don't see this case as extending it beyond the contours of the law as it stands now or doing anything that is inconsistent. Well, it will be, in my mind. I think if we affirm the District Court's position, it would be an extension in this sense. I think we would recognize there's some First Amendment protection for researchers. To me, that's an extension. I don't, you know, I was worried about this the first time around. I still don't see the cases. I mean, there's a Seventh Circuit case, but unusual situation where, you know, a vague,  it's entitled the First Amendment protection. Anybody associated with First Amendment protection. To me, that's a vast extension. I understand your question, your concern, Your Honor. And it's very specific to this context, however. And it's tied into the context because this arises within the context of abortion and fetal tissue collection and donation and research. And so there's a continuum here. It's not simply research in a vacuum and that any academic research by itself. That's a good point. Now, for instance, you know, why should, why is collection and delivery of fetal tissue a First Amendment activity? That's almost beyond me. It's like, you know, grub up delivering lunch to somebody at the laboratory. Isn't it? Your Honor, if it didn't, again, arise in the context of abortion and the provision of health care services within the provision of reproductive rights for women, which is such a controversial and such a politicized issue in this country, it's the connection to that that brings it within the First Amendment and brings it within both advocacy. What you're saying is any connection with the controversial topic entitles the person, you know, on the other end of the connection to constitutional protection. What case says that? Well, and not by itself, Your Honor. We would say that, again, it's the context here with the associated risk of harm. What is your best case to support First Amendment protection for persons associated with, I'll call it, fetal research? Yeah, it's the Herbert case out of the Tenth Circuit. The what circuit? The Herbert case. Out of which circuit? Out of the Tenth Circuit, which arose from the District of Utah. And in the Herbert case, the court found that associating with organizations for political, social, and education reasons involving abortion services was protected activity under the First Amendment. That's the closest case that we see that clearly recognizes this right here. The Ninth Circuit... One of the things you said bothers me, though, is you said, well, this in conjunction with the harm. But you don't get to the harm if there's not some First Amendment protection, I don't think. I mean, the harm is another prong of the preliminary injunction. But if all you... And the harm seems, obviously, in terms of personal risk and what's been happening in this arena, but you can't just protect harm hanging out there without some kind of substantive right, can you? That's correct, Your Honor. That's what gives rise to the basis for an injunction here. So I'm sorry if I misspoke. But the case that we think is most directly on point is the Herbert case, which does clearly recognize that right. Well, Herbert recognized protection for whom? Who's the recipient of the protection? Yeah, so the Planned Parenthood Organization was at issue there. The organization? Mm-hmm, and it... Okay, now that raises another question. Because here, I don't know if the birth defect laboratory is a separate entity or a part of the University of Washington. But here, it seems to me, I'll call it the owner of that right would be the University of Washington and not the individual researcher. Isn't that right? No, Your Honor... It's another word. You can analogize to those, what do you call those, the cases like, well, they start with Pickering and Garcetti. To me, the latest case on that. But when a person employed by the state speaks in official capacity, that's not protected individual activity for that person. Because those are words of the state. Isn't that the same thing when a University of Washington researcher is doing research in a lab funded by the state? That the research is the research of the state, not of the individual. And so there's no protection for the individual employee under the Garcetti line of cases. To get protection for the individual, the individual has to speak as a private citizen on a matter of public concern. And certainly, doing research and getting paid for it is not acting as a private citizen. It's acting as an employee of the University of Washington. So doesn't the University of Washington own, I'll call it own, the right to the research protection if anybody does? Under that line of cases? Perhaps under that line of cases. But under Dow, there's a finding that the researchers themselves, and it's the right to academic freedom as well as the right to, but found that First Amendment protection in the context of research within the Dow line of cases. There isn't another case since Dow. Well, let me see the Dow line of cases. I don't know. It's a very long line. No, there's not a long line, and that's what I was going to point out, Your Honor. There isn't another case since Dow that pushes past that or that challenges it in any way that limits its application and that we think would limit its application here. One thing to perhaps make clear for the Court is that when we were here before, we understand that there certainly were questions about the individuals at issue. And there are eight Doe plaintiffs. And those eight plaintiffs fall within three different groups. And we have since, as a matter of judicial record, it can be confirmed, but we have since certified a class that is based on those same three subgroups. And those subgroups are based on three things. One is it's the group of people who are advocates and who are practitioners and their staff. And so that would include people who work for, for example, the Planned Parenthood organization and advocate broadly for women's health services, but also abortion providers themselves, genetic counselors, people who are working directly to advocate for, educate, and gather fetal tissue. The second is the staff, the people who actually work at the lab. And then finally, it's researchers. With regard to the diagnostic lab, I take it that the lab engages in all kinds of research beyond just working with fetal tissue, and not every employee works on fetal tissue matters in some way. Is that a correct assumption? Um, potentially, Your Honor, but the, the fundamental point of the birth defects research lab is to act as a clearinghouse for fetal tissue collection and dissemination. And so certainly there may be some related activities, but that is the purpose of the lab. Which connects the two groups on each of the other sides. And so we view it as a continuum here, because the... So, and maybe I misunderstood the record, and I want to, an opportunity to clarify with you. The Seattle Children's Hospital Department of Laboratories, that falls within the University of Washington birth defects research lab? Or is that a bigger lab, and the research lab is some different component of it? Yeah, thank you for asking, Your Honor. So John Doe One is a person who works at Seattle Children's Hospital, and, and spoke to the facts regarding the, the lab at Seattle Children's Hospital. That's different than the lab that's at issue. In this case, which is the University of Washington's birth defects research lab, and Jane Doe Two speaks very specifically to the work that is done at what we call the lab. But we'll be talking... But Doe One is at Seattle Children's Hospital lab. That is correct. And is associated with research. Is that the, that individual's situation? I apologize, Your Honor. You're, I didn't understand your question. That person, John Doe or Jane Doe One is at Seattle Children's, and which category does that person fall in, in your three? You have advocates, the staff, and then you didn't get to three. Is that research? That's research, correct. All right. So that particular person is what, associated with research? Yeah, so John Doe One is, falls within both someone who's a practitioner, who helps coordinate as a pathologist, the donation of fetal tissue to the birth defects lab, but also participates in research. So falls within multiple categories. There's only one Doe who is solely a researcher, and that is Jane Doe Eight. Eight. And because, can you tell us what she does, or what, you know, her position is? Jane Doe Eight? Yeah, so she is an employee of the University of Washington. No, but what kind of work is she engaged in? She engages in, in different types of research, but research that uses fetal tissue, and looks specifically at certain, as I understand it, congenital birth defects, and uses that tissue as a part of her research. But, does that answer your question, Your Honor? In effect, one way to put it, she does either research on fetal tissue, or research that requires the use of fetal tissue, right? That is correct, Your Honor. Okay, thank you. And what about the invoices? So, immediately, Mr. Dalyden had taken off the table individual identifying information, and obviously the expenditure of money is not protected. It's a public matter under the Public Records Act, Public Disclosure Act. So that leaves only the titles, is that correct? There's disagreement, Your Honor, as to what's at issue, so let me address that very specifically. Mr. Dalyden made his public records request to the University of Washington, and in that request, did not limit it, or say in that request, except for personally identifying information, or except for anything in particular. He made a broad request. That gave rise to this litigation. After the litigation commenced, there was discussion about whether he would agree to certain redactions, and he did agree to a handful of redactions. So that's where we are now. But he didn't agree to the scope of redactions that are required under the injunction. Right, so now he wants the job titles underdacted to the extent that they're reflected on the invoices. Correct, and he also still wants... Can you address that? Yes, Your Honor. So with respect to job titles, the concern there is that there may be instances where there is only one individual who has the job that's at issue, and so identifying that individual by job title alone is sufficient to, in combination with... There may be, or there are? Your Honor, we are not the University of Washington, so we don't have access to full But yes, there's a concern that there are individuals who, by virtue of their job titles alone, would be identified. There are only 600 individuals at issue in this case, in total. Well, that's a lot of individuals. And 5,000 documents. But in scoping, though, when we're talking about where this goes and how broadly this goes, what I'm showing is that there's a limited parameter. And so, to the extent that the university, in its review of documents, which it does in every case, it has to review documents for exemptions, determined that a job title may lead to disclosure of the individual. That's what... Does it matter if, as counsel said, some individuals have already identified themselves publicly? No, Your Honor, because under the Bainbridge case, the Bainbridge case, the Washington Supreme Court case recognized that there is a right to privacy, even if an individual previously had that information disclosed. And the court in that case, even though a record and a report had been disclosed to the public and was in the media, said that confirming that, in conjunction with a public records request, was not permitted under the law. But what if there's self-identification? Because some of these advocates are out there in the public advocating. Don't you see a difference between that and Bainbridge? We don't, Your Honor, because in this context, again, it's the identity of the individual in conjunction with this particular context. My time is up. I do want to thank you, and we do ask that you affirm the district court. Thank you. Thanks. May it please the Court. My name is Jeffrey Even. I'm a Deputy Solicitor General for the State of Washington, and with me at council table is Assistant Attorney General Nancy Garland. I'd like to touch on two points briefly in my very brief time. One is a set of questions that came up regarding the state court litigation over the state constitutional privacy right, and the other is perhaps to pick up on a question just posed by Judge Wynn, dealing with the nature of the work done by the Birth Defects Research Laboratory. Now, as I understand it, that, and I'll start there, that laboratory only works on fetal tissue issues. However, it's important to note that that lab is a clearinghouse, so the bulk of the research is not taking place there. It's the lab receives donations of tissue in and then distributes those out to other laboratories throughout North America, so there's tissue coming in, there's tissue going out for research. When we're talking about invoices, what we're really talking about there is cost recovery. It's not necessarily the expenditure of public funds. That is, if there is a shipping cost to send a tissue sample to another lab, the other lab may be reimbursing the University of Washington for that, and so that's much of what's going on. As far as the class is concerned, we have over 600 individuals altogether, a small minority of whom are actually University of Washington employees. And so the class is not necessarily uniform. Now, if I can turn to the status of, well, what's happening in state courts. As my friend Ms. Olson recited, the WPEA case is still pending on appeal in the Washington Supreme Court. The court heard argument about six months ago. A decision has not yet come out. Now, what I would suggest is that although, as she also correctly said, the facts of that case are very different than the facts of this case. What's important for this case is the analysis that the state court will eventually bring to the state constitutional question. It may be that WPEA does not, in and of itself, answer the state constitutional question here. That's what I'm saying. We can't control what the scope and the background that the Washington Supreme Court is going to use to decide that case. But let me just ask you here, we have two grounds by the district court of likelihood of success. We wouldn't need to reach the Washington ground, would we? If the court resolves the case on federal issues, no. Then the court, I think, not only wouldn't need to address the state question, but probably should refrain from doing so and simply leave that to the state courts. And we're always reluctant in cases involving state constitutions to try to intercede. And now we have an unusual case where the scope of that could well be before the Washington Supreme Court. That's right. And depending on where the court, what the court's analysis is as to the federal issue and what eventually happens from the state court, it may be appropriate to certify a question to the state court. It may be a matter of seeking supplemental briefing. We don't know because we haven't seen that disposition. Well, of course, there's the, you know, I guess the opposing doctrine of constitutional avoidance, which is try to avoid Federal constitutional questions. But maybe we'll have to resolve that. Let me go back and ask you a question about something you said a while ago. You said only a small minority of this, I guess, class of 600 are state employees, right? That's correct. How do the other names get into state records? That'd be by communications coming to and from the state agency. I mean, because they're, you know, between buyers and sellers, you know, co-researchers, can you tell us generally what kind of communications you're talking about? Well, I think we want to say not buyers and sellers because we're talking about donations and recoupment of costs here, not buying and selling. But yeah, that would be the kind of issue that there's a donation coming from ultimately from a patient somewhere coming into BDRL and then research either being done there or the tissue sample is distributed out. The BDRL itself is a part of the University of Washington, right? It is part of the University of Washington. When you say a small minority, what's your estimate of, you know, what percent? Maybe 5%. I don't have that as a precise fact, so I'm ballparking that. Now, as far as you or your client, University of Washington is concerned, do you recognize that there's a right to constitutional protection and the First Amendment for research? What's your position on that? Well, I think that's... Or you don't have one. Yeah, I think it's more that we don't have one. But I would point out that there's two related concepts here. And with the court's indulgence, if I can complete my answer, there's some questions earlier, I think, coming in the context of like an intellectual property concept. Somebody does a work for hire. You're doing research as an employee. And in that kind of a scenario, maybe we're talking about a research product that winds up being owned by the ultimate employer. However, there's also an academic freedom line of cases to think about here. And the university would be concerned about the academic freedom of its faculty and researchers. Well, is academic freedom a concept or an issue that's raised in this case? Not by the university. So I guess I can't really go beyond that in terms of speaking substantively to the point. But I tell you, the university would defend or take the position on the part of a faculty member who advocates a controversial position. Let's leave the abortion situation aside. Let's say you have a faculty member who's advocating for if that's possible, the university would take a position that that research that the person had done in connection with communism, socialism, et cetera, is part of a First Amendment right, correct? That it's academic freedom. Now, I think I have to preface this ultimately by saying I don't know because I haven't thought about this point. But the suggestion in your question is a reasonable one. The university could also have some concern as being a state agency that there is a state ethics act that limits the ability to use public resources to engage in political advocacy. But your question doesn't- That would blow up the whole university system if that were the case. If that really were a guiding principle. And it only relates to the use of public resources. So these are- So I'm issue spotting here, I think, more than giving you a good answer to your question. All right. Speaking of public resources, I have one more related questions. I know, secondhand, I think Judge McKeon probably is much closer to this issue than I am. But individual employees or say faculty members of the University of Washington can go out and secure research grants of their own, right? Yes, that's my understanding. Under which, you know, at least some of the costs are not borne by the university. That's correct. So what is the relationship of the university or the state with respect to that kind of research? I mean, like, do they claim- I know there's been a lot of litigation on it, for instance, in the past, in the University of California about, you know, who owns the patent and that kind of stuff. I mean, who, you know, who's the recipient of the research? I'll call it privilege in that situation. I believe there are provisions in the Public Records Act that provide exemptions for that kind of research that's done through some kind of a private grant there. And there have been instances in which some kind of a- in which statutorily the legislature has even allowed some flexibility here for individual faculty members to even personally profit from their own research because of that kind of a scenario. But isn't it sort of a fact that in virtually every grant, whether you get a federal government grant or a private grant, the university takes a haircut, an administrative haircut, in terms of being the administrator of that grant because the individual faculty member is an employee of the state? And somebody has to account for money coming in and somebody has to account for money going out. That's right. Do you- what is the university's position if you have one on this invoice situation and the job title issue? Because if we exclude, as Mr. Dalyden does, names and other personal identifying information, it seems we're left with a dispute over invoices that might include job titles. Does the university have a position on that? The university does not. Now, I would note, however, that when Mr. Dalyden makes what he calls a clarification and says, no, I don't want this set of personally identifying information, that doesn't necessarily dictate the university's response to the request. That is, Mr. Dalyden- Modifies his request, though, then you're only going to look at what he asked for, right? He's the master of his request, but the university is the master of the response. Right. And so, as a general matter, if we kind of got out of the facts of this case and somebody said, I'd like records on subject X, and that search turns up a record that talks about subject X, but then maybe it's an email and the next paragraph goes into something completely unrelated, standing alone, the Public Records Act would not allow a state agency to redact that second thing as being non-responsive. What happens here is that discussion took place in the context of litigation, and is there a way we can resolve this? Obviously, it didn't. But that does change the complexion of it. And so, it's not really a matter of, you know, those are not at issue. They are coming up on records that are within the scope of Mr. Dalyden's request. So, there is still an issue here as to those records, as to that information. Thank you. Thank you. Mr. Breen, we took a little extra time with the other side. So, if you would just add another minute to his time. Thank you, Your Honor. Just, I want to reiterate, from our position, this case has nothing to do with academic freedom or expression. And you can just look at the injunction they requested. It was not in any way to touch the contents of any sort of research. And we've got 5,000 pages of documents now, and not one of them has been brought forward as some sort of evidence of either expressive activity or in any way academic freedom-type activity or anything that is a problem under those circumstances. And, Your Honors, I would just caution, when we talk about, I know there was a mention of the sky is falling, but Your Honor's rulings and the district court's rulings are very consequential. Even today, under the district court's injunction, it doesn't just impact Mr. Dalyden's records request. It impacted a request by the United States Congress for these records. They were redacted by the university and sent back to the Congress. They did not give them unredacted records. Today, you couldn't have a phone directory. But they didn't sue. They didn't sue. They decided not to sue. But should they have to? That is a question. I might also say, you know, that the counsel noted that if this did not arrive in the context of abortion, we essentially wouldn't be here. And I might urge that controversy is reason for sunlight, not reason for cloaking government activity. Otherwise, that public records officer is going to have to sit there and go, well, is this request about genetically modified organisms or wolf research or climate change or nuclear power, gender studies or animal lab experimentation, is it too controversial? Maybe I have a 1983 duty to stop the disclosure. As well, in terms of the error here, this strong legal error, misinterpretation of the First Amendment, that goes against the State of Washington's Supreme Court, its own interpretation of the First Amendment. And I understand that certainly it's a State court, it's a Federal court, but in terms of respecting those decisions of a court that has very carefully looked at its own public records act, the Nissen case, the West case, both of them dealt with this issue of First Amendment associational rights and using that as a shield against the disclosure of public records. And in both of those cases, the Washington Supreme Court had said, no, there is no First Amendment associational right in these appropriately public records. So this Court's decision could be revealed — well, the district court's decision essentially interferes with or conflicts with those decisions of the Washington Supreme Court interpreting its own act in light of the First Amendment. And then, Your Honors, I would just note on the Herbert case, that is an unconstitutional conditions case. That is a viewpoint discrimination of a type that was, you know, it should be condemned. And as I understand it, today, this morning, the Supreme Court denied certiorari on that case. I think it was a 6-3 vote. So — and it appears appropriately so. We don't take people's political views into account when we make government decisions. The Public Records Act, though, is careful not to do that, as was pointed out by the amicus. And so for that reason, Your Honors, as well, I would note, the district court, we are — we have continued, we have now stayed after doing a bit of discovery, but this Court, we are going to be back in front of you in another year on the exact same legal point if we don't get a ruling clarifying what the First Amendment does and doesn't, what is and is not part of the First Amendment. And really, the facts aren't going to change, the law is not going to change. We would just respectfully ask for a clear ruling from this Court now so that we can proceed, if there is anything else. And I just might note, if this Court reverses the injunction, what happens? We get another set of documents with job titles unredacted, the request is fulfilled, and we move on and have a, you know, do something else. So thank you, Your Honors. Thank you. Thank all counsel for your arguments in this very interesting case. Thank you for coming to San Francisco for the argument. The case just argued is submitted and we're adjourned.
judges: Tashima, McKeown, Nguyen